UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TANIA GUEORGUIEV,

       Plaintiff,                          Case No. 15-CV-13676
vs.                                            HON. MARK A. GOLDSMITH

THE UNITED STATES LIFE
INSURANCE COMPANY IN THE
CITY OF NEW YORK, et al.,

       Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT THE UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF NEW YORK'S MOTION FOR SUMMARY JUDGMENT (Dkt. 63) AND DENYING PLAINTIFF'S AMENDED MOTION IN LIMINE TO EXCLUDE TOXICOLOGY REPORT, OR ALTERNATELY, TO COMPEL DISCOVERY (Dkt. 77)**

       This matter is before the Court on Defendant The United States Life Insurance Company in the City of New York's motion for summary judgment (Dkt. 63), and Plaintiff's motion in limine to exclude toxicology report, or alternately, to compel discovery (Dkt. 77).  The issues have been fully briefed, and a hearing was held on September 22, 2016.  Defendant seeks a ruling that an insurance contract was formed between Plaintiff and Defendant, which included exclusions for losses that were incurred as the result of committing a crime or being intoxicated.  Defendant also seeks a ruling that a toxicology report proves that the exclusions apply and relieves Defendant of its obligation to pay benefits to Plaintiff.  Plaintiff seeks to exclude the toxicology report on the ground that Defendant has failed to lay an adequate foundation for the report.  In the alternative, Plaintiff seeks an order from this Court compelling Defendant to provide further information regarding how the results contained within the report were reached.   For the reasons explained below, the Court grants in part and denies in part Defendant's motion, and denies Plaintiff's motion.

1

## I. BACKGROUND

Plaintiff and the decedent, her husband Peter Gueorguiev, received a mortgage loan from CitiMortgage, a former defendant in this case. Enrollment Form, Ex. E to Pl. Resp., at 1 (Dkt. 70-6). As part of the mortgage, Plaintiff and the decedent were offered the opportunity to purchase coverage under a policy of group accidental death and dismemberment insurance that was underwritten by Defendant. Id.

Defendant claims that the decedent purchased the policy and named Plaintiff as the beneficiary, but a review of the enrollment form for the policy demonstrates that it is unclear whether both parties were the insureds and whether both parties are beneficiaries. Id. Under the section entitled "Enrollment Options," the form has the names of both Plaintiff and the decedent printed. Id. However, a line was drawn through Plaintiff's name, which indicates that she would not be insured by the policy. Id. Yet, under the section entitled "Insured's Birth Date," there are two dates listed, and under the section entitled "Beneficiary," both Plaintiff's and the decedent's names are listed. Id. The decedent is the only person to have signed the enrollment form dated December 27, 2006. Id.

On February 1, 2007, a cover letter and Certificate of Insurance were sent to the decedent. Cover Letter, Ex. D to Pl. Resp. (Dkt. 70-5). The letter stated that the Certificate of Insurance for the policy that Plaintiff and the decedent applied for was enclosed. Id. Plaintiff argues that the enclosed document was a one-page document that lists the certificate number, group policy number, effective date, the participating association, and the schedule of benefits. See Plaintiff's Purported Certificate of Insurance, Ex. F. to Pl. Resp., at 1 (Dkt. 70-7). Defendant contends that the enclosed document was a four-page document that, among other things, sets forth the exclusions in the policy. See Defendant's Purported Certificate of Insurance, Ex. A. to Def. Reply, at 1 (Dkt. 73-2).

The purported insurance policy provided by Defendant states that benefits will be provided in the event of the accidental loss of life. Insurance Policy, Ex. A to Def. Mot., at 13 (cm/ecf page) (Dkt 63-2). The purported insurance policy includes a section that states that "[i]f benefits are payable under the Accidental Death section of this policy, United States Life will pay the amount indicated in the Schedule of Benefits for loss which results from a covered accident which occurs while the insured person is driving . . . in a private passenger car." Id. The policy also contains various exclusions, of which two are relevant here: commission of a crime and intoxication. Specifically, the policy provides that "no benefits will be paid for any loss that results from or is caused directly, indirectly, wholly or partly by . . . 5. Committing a crime, or an attempt to do so . . . 6. Being intoxicated or under the influence of any drug, unless taken as prescribed by a physician." Id.

Sometime between 11:30 p.m. on August 8, 2013 and 1:00 a.m. on August 9, 2013, the decedent was driving north on M-30 in Edenville Township. Traffic Crash Report, Ex. C to Def. Mot., at 3 (cm/ecf page) (Dkt. 63-4). As the road began to curve to the right, the decedent drove off the road. Id. The decedent proceeded to drive through a fence and into an unoccupied building. Id. The decedent was pronounced dead at the scene by Dr. Dennis Wagner, the Midland County medical examiner. Incident Report, Ex. D. to Def. Mot., at 5 (Dkt. 63-5). Among the items recovered from the decedent's vehicle was an open bottle of Jack Daniels whiskey. Property Receipts, Ex. G to Def. Mot., at 3 (cm/ecf page) (Dkt. 63-8). At 3:08 a.m., Wagner took a blood sample from the decedent. Blood Sample Collection Form, Ex. E to Def. Mot., at 1 (cm/ecf page) (Dkt. 63-6). On August 16, 2013, Greta Gill, a forensic scientist with the Michigan Department of State Police, conducted an analysis of the blood taken by Wagner. Laboratory Report, Ex. F to Def. Mot., at 2 (cm/ecf page) (Dkt. 63-7). The analysis revealed that the decedent had a blood alcohol level of 0.15. Id.

Plaintiff filed a claim with Defendant for the proceeds of the insurance policy, see Claim Form, Ex. J to Def. Mot., at 1 (Dkt. 63-11), which was denied. Letter from AIG Benefits Solutions to Plaintiff's Counsel, Ex. K to Def. Mot., at 3 (cm/ecf page) (Dkt. 63-12). Defendant noted that Plaintiff's blood alcohol level was 0.15 at the time of his death. Id. Defendant stated that, as a result, policy exclusions five and six relieved Defendant of paying benefits to Plaintiff because the decedent died as the result of committing a crime and being intoxicated. Id. Plaintiff appealed the denial of her claim. Letter from Plaintiff's Counsel to AIG Benefits Solutions, Ex. L to Def. Mot., at 2 (cm/ecf page) (Dkt. 63-13). In her letter of appeal, Plaintiff theorized that the crash could have been due to previous chest pain or that the analysis of the decedent's blood was simply mistaken. Id. at 5. Defendant subsequently denied Plaintiff's appeal. Plaintiff then filed the instant action, alleging three counts: breach of contract, negligence, and tortious interference with a contract.[1]  Third Am. Compl. (Dkt. 24).

## II. STANDARD OF REVIEW

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making this determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." U.S. S.E.C. v. Sierra Brokerage Servs., Inc., 712 F.3d 321, 327 (6th Cir. 2013). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). In considering the material facts in the record, a court must recognize that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position

---

[1] In her response to Defendant's motion for summary judgment, Plaintiff states that she is voluntarily dismissing her negligence and tortious interference claims against Defendant. Pl. Resp. at 14 (Dkt. 70). Defendant has not raised an objection; therefore those counts are dismissed.

4

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 422. In this case, Defendant bears the burden of proving that any coverage under the policy is negated by an exclusion. Monteleone v. The Auto Club Grp., 113 F. Supp. 3d 950, 959 (E.D. Mich. 2015). "Where the moving party has the burden . . . his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (citation and internal quotation marks omitted).

### III. ANALYSIS

The issues concerning Defendant's motion for summary judgment and Plaintiff's motion in limine, especially as they concern the admissibility of the toxicology report, are intertwined. As a result, the motions will be analyzed together.

#### A. Contract Formation

After reviewing the limited record presented by the parties, the Court holds that there is a genuine dispute of fact regarding whether there was a contract between the parties and, if there was a contract, what the terms were. To begin, it is unclear from the enrollment form whether the contract insured both Plaintiff and the decedent, or just the decedent. Although a line is drawn through the Plaintiff's name on the enrollment form, two birthdates are listed, and both Plaintiff and the decedent are listed as the beneficiaries. Enrollment Form at 2 (cm/ecf page). Furthermore, the enrollment form does not specify what exactly the prospective insured was actually applying for. The form merely states that "I hereby enroll in the $1,000,000 Family Protection Plan underwritten by United States Life." Id. The form does not specify if this "plan" is the alleged insurance contract in question or something else. Finally, the form is not clear regarding what is meant by the phrase "I hereby understand the exclusions and limitations of this program." Id. The form does not state what the exclusions and limitations are or how they were communicated to the prospective insured.

Defendant provides the affidavit of Peggy Riegert, a technical claims analyst for Defendant, but Riegert does not explain the issues regarding the application process and how policies are actually issued. She merely states that the decedent purchased coverage under a policy of group accidental death and dismemberment insurance and named Plaintiff as the beneficiary. Decl. of Peggy Riegert, Ex. B to Def. Mot., at 1-2 (Dkt. 63-3). Riegert also restates the exclusions set forth in Defendant's purported insurance policy. Id. at 2-3. Riegert fails to explain what is meant by the terms "$1,000,000 Family Protection Plan" and what exactly the exclusions and limitations of the purported policy were. Riegert also does not address the contents of the Certificate of Insurance and does not provide any clarity regarding the dispute about which document actually constitutes the certificate. Notably, Riegert does not explain the purpose of the one-page document that Plaintiff claims was the certificate of insurance or how it was transmitted to Plaintiff and the decedent.

There also is no explanation regarding how the policy was issued to Plaintiff and the decedent. The record indicates that the policy was issued in conjunction with a mortgage provided by CitiMortgage, yet there is nothing in the record indicating which company actually communicated with the decedent and Plaintiff regarding the terms of the policy prior to issuance.

Without answers to these questions, it is impossible for the Court to determine with any degree of confidence – much less to determine as a matter of law – what the specific contents of the insurance policy were and whether those contents included the exclusions upon which Defendant relies in its motion. All of these issues will require further factual development at trial.

**B. Toxicology Report**

Plaintiff also argues that, even if the exclusions regarding criminal acts and intoxication are part of a contract with Defendant, Defendant has failed to lay an adequate foundation for the use of the decedent's blood test results. Plaintiff cites to the Michigan Court of Appeals' decision in Gard v. Michigan Produce Haulers, 174 N.W.2d 73 (Mich. Ct. App. 1969), for the proposition

6

that Defendant has failed to meet a nine-part test to admit the results of a blood test. "In federal diversity actions, state law governs substantive issues and federal law governs procedural issues." Legg v. Chopra, 286 F.3d 286, 289 (6th Cir. 2002) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)). "Rules of evidence are deemed rules of procedure . . . and therefore, the Federal Rules of Evidence, rather than state evidentiary laws, are held to apply in federal diversity proceedings." Id.  As a result, Gard is inapplicable, and this Court applies the Federal Rules of Evidence to determine whether the results of a blood test are admissible. See Huss v. United States, 738 F. Supp. 1098, 1111 (W.D. Mich. 1990).

Plaintiff also argues that the blood test results do not meet the test of reliability set forth in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). In Daubert, the Supreme Court held that Federal Rule of Evidence 702 requires a trial court to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." Id. at 589. The Court then suggested a list of factors for courts to consider when deciding whether proposed scientific expert testimony is sufficiently reliable. These factors include (i) whether the methodology utilized by the expert can and has been tested, (ii) whether the theory or technique has been subject to peer review, (iii) the known potential rate of error and the existence of standards controlling the technique's operation, and (iv) the extent to which the methodology or technique employed by the expert is generally accepted in the scientific community. Id. at 592-594.

Plaintiff's argument is atypical in that she is bringing a Daubert challenge against the toxicology report alone, rather than challenging any proffered expert testimony. However, "[u]nder Daubert, the trial court acts as a 'gatekeeper' that ensures that any and all scientific testimony or evidence admitted is not only relevant, but reliable." United States v. Carpenter, No. 12-cr-20218, 2013 WL 6385838, at *5 (E.D. Mich. Dec. 6, 2013) (emphasis added). As Plaintiff notes in her motion in limine, Defendant has failed to identify any expert witness who can testify to the methods and reliability of the toxicology report. It is well settled that the burden is on the

7

proponent of the expert evidence to prove that the evidence is admissible. Daubert, 509 U.S. at 592 n.10 (1993). The record is devoid of an affidavit from Gill or Wagner describing in detail how the blood was collected, transported, and analyzed.[2] Nor are there any affidavits from other experts explaining why the methods used to analyze the blood are reliable.

In essence, Defendant is acting as its own expert witness by submitting the toxicology report and assuring the Court that the results are reliable. In Loan v. Prudential Insurance Company of America, 370 F. App'x 592, 596 (6th Cir. 2010), the Sixth Circuit held that a toxicology report unsupported by an expert witness was insufficient to prove reliability. In that ERISA case, the decedent, Ernest Loan, had purchased coverage under a group accidental death insurance policy that contained an exclusion for losses resulting from "[b]eing legally intoxicated." Id. at 593. Just prior to his death, Loan fell down two flights of stairs after consuming three glasses of wine. Id. Upon being transported to the hospital, Loan had his blood drawn. Id. The toxicology report stated that he had a blood alcohol level of 0.146. Id. at 594. After Loan succumbed to his injuries, the defendant denied coverage to the plaintiffs on the basis of the toxicology report. Id. at 593.

After the district court affirmed the denial of benefits, the Sixth Circuit reversed, stating that "[w]ithout the benefit of a toxicology expert's analysis, it is difficult to determine whether the report in question was reliable." Id. at 597. The court ultimately held that "it was unreasonable under the circumstances for Prudential to rely on this toxicology report alone, without the benefit of expert analysis, to determine that the decedent was legally intoxicated." Id. The court noted that the plaintiffs had contested the reliability of toxicology reports in general, and also questioned the methods and circumstances surrounding Loan's blood draw. Id. at 596. Specifically, the court

---

[2] Although Defendant is correct that the incident report states that Wagner took a blood draw using a Michigan State Police blood kit, this is the only information provided regarding the collection of the decedent's blood. Incident Report at 5.

8

validated some of the same concerns raised by Plaintiff here – that blood levels can rise after an accident and that some factors may produce a false blood alcohol reading:

> Plaintiffs have raised a number of doubts as to the reliability of toxicology reports generally and the reliability of the specific toxicology report generated in this case. Concerning toxicology reports generally, Plaintiffs cite expert treatises detailing the unreliable nature of moving from an estimated BAC value to an assessment of the degree of intoxication during the relevant period. See, e.g., 1 McCormick on Evidence § 205 (6th Ed.) (" . . . one cannot assume that BAC inevitably is higher at the time of an accident than it is afterwards, at the time of testing, for the concentration rises after drinking, then drops. Extrapolations based on direct measurements of BAC therefore seem more perilous than is generally recognized . . . ") . . . Plaintiffs also point to the variety of factors that may affect BAC over time, including food intake, type and quantity of alcohol, weight, sex, body fat percentage, and rate of absorption . . . Without the benefit of a toxicology expert's analysis, it is difficult to determine whether the report in question was reliable.

Loan, 370 F. App'x at 596-597.

In our case, Plaintiff has similarly raised questions regarding the reliability of toxicology reports and the circumstances of the decedent's blood draw, demonstrating the insufficiency of the report to validate itself. Plaintiff cites to authority showing that Michigan police laboratories routinely did not account for the potential rate of error at the time the decedent's blood was analyzed. Pl. Resp. at 10-11; Michigan's Uncertainty Budget, Ex. N to Pl. Resp. (Dkt. 70-15). Like the plaintiffs in Loan, Plaintiff also cites to authority "detailing the unreliable nature of moving from an estimated BAC value to an assessment of the degree of intoxication during the relevant period." Loan, 370 F. App'x at 596. Plaintiff has quoted reports that attribute elevated blood alcohol levels to post-mortem activity, noting that this may have accounted for the decedent's high blood alcohol level. Pl. Resp. at 7-8; Interpreting Results in Postmortem Species, Ex. L. to Pl. Resp. (Dkt. 70-13). Like the court in Loan, this Court finds it difficult to determine the reliability of the report without the assistance of an expert opinion. Defendant has not met its burden of proving the reliability of the toxicology report at this stage of the proceedings.

Plaintiff argues in his motion in limine that, because there is not yet an adequate foundation to support the toxicology report, this Court should exclude the report entirely.[3] In a case with such a limited record, the normal course of action would be to hold an evidentiary hearing in regard to Plaintiff's Daubert challenge. See Jahn v. Equine Servs., PSC, 233 F.3d 382, 393 (6th Cir. 2000) ("[A] district court should not make a Daubert determination when the record is not adequate to the task."). However, in light of the fact that this matter will be proceeding to a bench trial, the Court believes a Daubert hearing to be unnecessary. The Sixth Circuit has held that Daubert hearings are primarily used "to protect juries from misleading or unreliable expert testimony" and are "largely irrelevant in the context of a bench trial." Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 851-852 (6th Cir. 2004). Because the Sixth Circuit has recognized that a "district court is not obligated to hold a Daubert hearing," Clay v. Ford Motor Co., 215 F.3d 663, 667 (6th Cir. 2000), the Court will rule on the admissibility of the toxicology report at trial, where all evidence bearing on its reliability can be presented.

### C. Interpretation of the Insurance Policy

Finally, Plaintiff argues that exclusion number five requires that the insured's criminal act be proven by evidence of a conviction. The exclusion states that "[n]o benefits will be paid for any loss that results from or is caused directly, indirectly, wholly or partly by . . . 5. Committing a crime, or an attempt to do so." Insurance Policy at 12. Plaintiff argues that, because the decedent was never convicted of a crime, exclusion number five to the policy does not apply. However, the Michigan Court of Appeals has already addressed this issue, holding that "[i]n considering whether a policy exclusion for criminal conduct bars coverage, the relevant inquiry is whether criminal conduct occurred, not whether it was charged." Weitzel, 2005 WL 233928, at *1; see also Allstate

---

[3] In the alternative, Plaintiff requests that this court order Defendant to "provide more definitive responses to Plaintiff's discovery requests and/or produce its expert witness for deposition." Pl. Mot. at 10. In light of the fact that the discovery and dispositive motion deadlines have long since passed, the Court declines to order any further discovery.

10

Ins. Co. v. Keillor (On Remand), 511 N.W.2d 702, 705 (Mich. Ct. App. 1993) (exclusion applied where insured committed a criminal act for which she was not prosecuted).  Exclusion number five does not require a criminal prosecution or conviction.

## IV.  CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Defendant's motion for summary judgment (Dkt. 63).  The Court also denies Plaintiff's motion in limine (Dkt. 77) and holds that the matter will proceed to a bench trial in lieu of a Daubert hearing.

SO ORDERED.

Dated:  October 19, 2016          s/Mark A. Goldsmith
        Detroit, Michigan          MARK A. GOLDSMITH
                                   United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 19, 2016.

                                   s/Karri Sandusky
                                   Case Manager